**In the Matter of the Application for the DISCIPLINE OF Tilmer Eugene THOMPSON, an Attorney at Law of the State of Minnesota.**

No. C9–67–39495.

Supreme Court of Minnesota.

April 5, 1985.

Richard T. Oakes, St. Paul, James Kerr, Jack S. Nordby, Minneapolis, for appellant.

Michael J. Hoover Dir. of LPR, William J. Wernz, St. Paul, for respondent.

**PER CURIAM.**

T. Eugene Thompson has petitioned for reinstatement to the practice of law pursuant to Rule 18 of the Rules on Lawyers Professional Responsibility. The Director of the Lawyers Professional Responsibility Board investigated the petition and recommended that the petition be denied. A public evidentiary hearing was held by a panel of the Board on September 20, 1984. The panel also recommended that the reinstatement petition be denied. We adopt the panel's recommendation and deny the petition.

The petitioner was licensed to practice law in Minnesota on October 4, 1955. On December 6, 1963, he was convicted in Hen-

nepin County District Court of the first-degree murder of his wife Carol Thompson and sentenced to life imprisonment. He was suspended from the practice of law on May 4, 1964 pending completion of all appellate proceedings in connection with that conviction. The conviction was affirmed, *State v. Thompson*, 273 Minn. 1, 139 N.W.2d 490, *cert. denied* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966), and his disbarment followed. *In Re Application for Discipline of Thompson*, 296 Minn. 466, 209 N.W.2d 412 (1973).

Thompson was incarcerated from December 7, 1963 until approximately December 15, 1982 when he was placed in a halfway house on a work release program. On March 15, 1983 he was placed on parole. Since his release, the petitioner has been employed as a systems analyst. This petition for reinstatement was filed on September 12, 1983.

■ Rule 18, Rules on Lawyers Professional Responsibility allows for reinstatement of suspended, disbarred or resigned attorneys. The burden is upon the petitioner to establish by clear and convincing evidence that he has "undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." *In Re Smith*, 220 Minn. 197, 201, 19 N.W.2d 324, 326 (1945).

■ More specifically, in *Application of Swanson*, 343 N.W.2d 662, 664 (Minn. 1984), we reaffirmed our cautious approach to readmitting an attorney to practice and required a higher degree of proof of good moral character and trustworthiness than should be required in original admission. *See In Re Smith*, 220 Minn. 197, 200, 19 N.W.2d 324, 326 (1945). An element of the proof is the petitioner's "present ability to adhere to the strict code of professional morality * * *." *Matter of Peterson*, 274 N.W.2d 922, 926 (Minn.1979). We thus examine the recorded facts in light of this standard, together with our consideration of the offense for which the petitioner was originally disbarred. *Id.* at 926.

■ The conviction of first-degree murder underlying the disbarment is of particular consequence to this proceeding. In 1963, the petitioner was charged with and convicted of conspiring with others to cause the death of his wife in order to receive substantial insurance proceeds. The events leading to Carol Thompson's death were particularly appalling and heinous. Despite the conviction the petitioner did then and continues to assert his innocence of the crime and claims that, as a result, he need not demonstrate rehabilitation. We disagree with that basic premise and have examined the record to determine whether this petitioner has sustained the burden of establishing his fitness to return to practice. The petitioner has taken the position that he has demonstrated exemplary behavior in the more than 20 years since his 1963 incarceration. He asserts that his conduct was closely scrutinized while imprisoned and that his release on parole is compelling evidence of his certain rehabilitation. The director, on the other hand, has urged this court to adopt a rule that a petitioner's parole status precludes his reinstatement.

■ While we decline to adopt an absolute rule that continued probationary or parole status bars an application for reinstatement, we are not persuaded that evidence of conduct while a petitioner is incarcerated is demonstrative of moral fitness or rehabilitation. The constant scrutiny to which the conduct of a prisoner is subjected is intended to minimize his opportunity to exercise discretion or engage in conduct beyond that delimited by prison officials.

■ Similarly, the fact of the petitioner's release on parole cannot be construed as definitive assurance of his fitness to practice law; that fact is but a single element in his burden of proof. By its terms, the release is conditional; the petitioner remains in the legal custody and control of the Commissioner of Corrections and is subject to potential return to the facility if he deviates from established guidelines. Minn.Stat. § 243.05, subd. 1(d) (1984). A decision to release an individual on parole

reflects consideration of different factors and facilitates goals often separate and apart from those appropriate to a petition for reinstatement to practice law.

Even though it is not a prerequisite for readmission to the bar, final discharge from parole or probationary status should ordinarily precede an application for reinstatement. While more than the fact of final discharge is necessary to prove the petitioner's present ability to conform to the Code of Professional Responsibility, that the petitioner has complied with the conditions of parole for a period of time sufficient to satisfy the Commissioner of Corrections that the petitioner is reliable and trustworthy and will remain at liberty without violating the law and that final discharge is not incompatible with the welfare of society is certainly evidence relevant to the issue of the petitioner's fitness to return to the practice of law. Absent final discharge, there must be a showing—as the basis for a petition for reinstatement—that the petitioner has complied with the conditions of parole for a period of time sufficient, given the gravity of the crime for which the petitioner was convicted, to warrant an inference that the petitioner is reliable and trustworthy and will not violate the law.

The director relies heavily not only upon the nature and gravity of the original offense and the parole status of the petitioner, but also upon a series of events which have occurred since the petitioner's release to support the board's recommendation that the petition be denied. While the testimony with regard to each of these matters is disputed, there is little in the record in the nature of positive support for the petitioner's application.

During his incarceration, the petitioner purchased a condominium in Roseville. He leased the unit to an individual who made all mortgage payments and paid property taxes and association dues, subject to a reservation of a portion of the premises for the petitioner upon his release from prison. The petitioner's claim of entitlement to the homestead exemption pursuant to Minn. Stat. § 273.13, subd. 7 (1980) for real estate tax purposes during the period of incarceration was disallowed by the Commissioner of Revenue and by the Tax Court. While the director contends that the petitioner's declaration with regard to owner-occupancy, signed "Dr. T.E. Thompson," reveals a lack of trustworthiness, we do not address the question because merits of that separate proceeding are pending before this court.

The subject of considerable testimony at the time of hearing were the events surrounding Thompson's personal and financial relationship with Constance Applebaum after his release from prison. In October 1983, the petitioner signed a promissory note agreeing to repay Applebaum $35,000 in exchange for the redecorating of his condominium which they then shared. Despite the agreement that he would pay $100 per month commencing on November 15, 1983, the petitioner did not do so. He claims that his offers of payment were refused and that, as a practical matter, his obligation was offset by the benefit Applebaum received by residing with him rent free. When the parties separated, Applebaum removed the furniture on the assumption that Thompson's failure to repay her entitled her to possession of the goods purchased during redecorating. Thompson filed an insurance claim for the alleged loss of the property of which he claimed ownership. The parties ultimately settled this dispute and the claim was withdrawn.

The record discloses the existence of a will of Applebaum which was drafted during the time of the parties' relationship and which left a substantial portion of her property to Thompson. Despite the petitioner's denial, there is direct and circumstantial evidence that he drafted that will, which benefited him personally. Upon the parties' separation, Applebaum enlisted the assistance of another to draft a codicil which extinguished the petitioner's interest in her estate.

On yet another occasion, Thompson drafted a promissory note evidencing a loan of $2,000 to his daughter Patricia Mar-

able from Applebaum. The note contained an assignment of Applebaum's interest to the petitioner, so that he might supervise his daughter's repayment. His daughter made regular payments, but only the first three were actually remitted to Applebaum with the petitioner retaining the remainder. When no payments were forthcoming, Applebaum assumed that Marable was having financial difficulties and offered to cancel the obligation. Thompson rejected the offer, continued to receive and retain the money from his daughter and later testified that when he offered to pay Applebaum, he was repeatedly told to either return the money to his daughter or to keep it. He continued to collect the payments.

The record contains evidence that Thompson unilaterally disposed of furniture belonging to Applebaum and stored at the time she moved into his home. While he claims that the property was given to other people, the others denied the receipt of the furniture. Applebaum also testified that the petitioner retained certain items of personal property that had been loaned to him and that a loan of $1,300 to the petitioner specifically to pay law school tuition fees was never used for that purpose and was not repaid. Finally, Applebaum testified that Thompson physically abused her.

The petitioner asks this court to disregard the evidence presented with regard to this relationship on the basis that it is irrelevant to his fitness to practice law. He characterizes his conduct as evidence of his bad judgment in an emotional and highly personal relationship but not indicative of an inability or unfitness to actively resume his practice of law.

■ While the events leading to the termination of the relationship with Applebaum may have been unfortunate, those facts certainly do not afford positive support for the petitioner's claim for reinstatement. We simply cannot disregard the substantial evidence of these questionable financial dealings or conclude that the petitioner has sustained his burden of establishing by clear and convincing evidence that he has been rehabilitated and should be reinstated to the practice of law. We reach that conclusion with due regard for the petitioner's employment in a responsible position with a reputable business.

■ The petitioner has indicated, in the event the petition for full reinstatement is denied, that he would acquiesce in the imposition of any probationary period, conditions of supervision or other limitation on his practice which this court would view as appropriate for the protection of clients or other persons. Rule 15, Lawyers Professional Responsibility Board. We agree with the petitioner that a restricted status or probation would be appropriate in the event of the reinstatement of one who has not been granted a final discharge from sentence. Since, however, we have concluded that the petitioner has failed to sustain his burden of proof of a present fitness to enjoy the public confidence and trust he forfeited, there is no basis for considering the alternative disposition suggested by the petitioner.

Thompson also asks us to fix a date on which he may reapply for reinstatement. On the record before we are unable to designate a reapplication date more specific than one implied by the general limitations set out above.

Petition denied.